[Civ. No. 24018. Second Dist., Div. Two. Apr. 20, 1961.]

WESTERN AIR LINES, INC. (a Corporation), Respondent, v. JOHN G. SOBIESKI, as Commissioner of Corporations, Appellant.

Stanley Mosk, Attorney General, Lee B. Stanton, Deputy Attorney General, and Richard W. Jennings for Appellant.

Darling, Shattuck & Edmonds, Hugh W. Darling, O'Melveny & Myers and Pierce Works for Respondent.

McMURRAY, J. pro tem.*—This is an appeal by the Commissioner of Corporations of the State of California from a judgment of the superior court in an action brought by Western Air Lines, Inc., for a writ of mandate to review a final order rendered by the commissioner. By its judgment, the superior court, in substance, determined that the commissioner had exceeded his jurisdiction in purporting to act on a change in voting rights of its shareholders attempted by Western Air Lines, Inc., by means of amending its articles of incorporation.

Western, as the respondent herein will be called, is a Delaware corporation with its principal place of business in California. Western's original predecessor was incorporated in California in 1925; thereafter, in 1928, a Delaware incorporation was effected. This Delaware corporation, under a permit

---

*Assigned by Chairman of Judicial Council.

applied for and granted by the California Corporations Commissioner, exchanged its shares for all of the outstanding shares of the California corporation in 1929, and the California corporation then became a wholly owned subsidiary of the Delaware corporation. This wholly owned subsidiary was dissolved in 1934. The certificates of incorporation of both of these corporations contain provisions for cumulative voting.

On April 19, 1956, a group of Western's minority shareholders voted their shares cumulatively and elected two of Western's 13 directors. The board of directors thereafter met and, by amendment of the by-laws, increased the number of directors from 13 to 15. On July 12 and 13, 1956, the board resolved to eliminate cumulative voting for directors and began proceedings in compliance with the relevant Delaware laws to amend the certificate of incorporation with a view to the elimination of cumulative voting rights.

A proxy statement and proxy form for voting against cumulative voting were sent to each shareholder on July 31, 1956. The commissioner, by letter on August 28, 1956, advised counsel for Western that in his opinion the proposed amendment of the articles of incorporation would constitute a "sale" of securities within the provisions of section 25009, subdivision (a), of the Corporations Code,[1] and, further, that pursuant to section 25500[2] of the same code Western should not engage in the solicitation of proxies or hold a shareholders meeting for the purpose of amending the articles until Western had applied for and received a permit authorizing such action from the commissioner.

Western applied for such a permit, reserving, however, the right to question the jurisdiction of the commissioner to require such a permit. The commissioner granted a negotiating permit, but expressly reserved the issue of "fairness" under Corporations Code, section 25510,[3] and conditioned the issu-

---

[1]Section 25009: "(a) 'Sale' or 'sell' includes every disposition, or attempt to dispose, of a security or interest in a security for value.

" 'Sale' or 'sell' includes all of the following . . . an exchange; any change in the rights, preferences, privileges, or restrictions on outstanding securities."

[2]Section 25500: "No company shall sell any security of its own issue . . . until it has first applied for and secured from the commissioner a permit authorizing it so to do."

[3]Section 25510: "When application is made for a permit to issue securities . . . the commissioner is . . . authorized to approve . . . the fairness of such terms and conditions. . . . After such hearing the commissioner may refuse to issue the permit authorizing such exchange if in his opinion the plan is not fair, just, or equitable to all security holders affected."

ance of the permit upon nonfiling of the proposed amendment with the Secretary of State of Delaware until a further permit had been obtained from the commissioner. The negotiating permit granted further authorized the use of any proxies received by management before its issuance, provided that such proxies were not thereafter revoked. Western so advised its shareholders and clarified certain matters contained in the original solicitation which had been objected to by the Securities and Exchange Commission as misleading. It did not forward any new proxy forms and subsequently voted those proxies which had been received before the objection of the commissioner and the Securities and Exchange Commission, except those proxies expressly revoked.

On October 10, 1956, at a shareholders' meeting, 442,780 shares voted in favor of eliminating cumulative voting and 199,810 voted against such change. Outstanding shares then numbered 743,963 shares, requiring a vote of 371,982 to abolish cumulative voting. Included in the voting were 194,278 proxies obtained prior to sending the explanatory letter and the obtaining of the negotiating permit. On October 15, 1956, Western applied for a supplemental permit to effect the elimination of the provision for cumulative voting from its articles. After notice to all shareholders, a hearing on the fairness of the proposed amendment was held by the commissioner. Upon conclusion of the hearing, the commissioner made detailed findings of unfair, unjust and inequitable actions and conduct by Western and its management. Among the findings made by the commissioner were specific findings that indicated that Western's business in California was of a substantial nature and that California residents were the holders of over 30 per cent of the outstanding shares in Western.

Western's certificate of incorporation, as permitted by the laws of Delaware, contained an article providing for cumulative voting and an article reserving the right to "amend, alter, change or repeal any provision" in the certificate. The stock certificates issued by Western also contained a written provision to the effect that by acceptance thereof the holder "assents to and agrees to be bound" by all the provisions of the certificate of incorporation. The final step to effect amendment of the articles of incorporation under Delaware law is the filing of such amendment with the Delaware Secretary of State.

What the commissioner described as his "terminal findings" were, in essence, that Western's management was de-

termined not to relinquish control, nor to tolerate any inter-
ference from minority shareholders, or directors representing
them, and that the resolution enacted to eliminate the minor-
ity's right to cumulative voting would be ". . . unfair, un-
just and inequitable to the great number of security holders
residing in California." On the basis of the findings, the
commissioner concluded that he had jurisdiction under Cor-
porations Code, sections 25009, 25500, 25510, *supra*, and
22507,[4] and that the change in the right and privilege of the
shares from cumulative to straight voting would constitute
a "sale" and an "exchange" within the meaning of section
25009, subdivision (a), and section 25510 of the Corporate
Securities Law. The commissioner further found that the
solicitation materials of respondent were prepared and mailed
from California; that both shareholders of record and bene-
ficial owners of shares of Western, resident in California,
were solicited in California in order to accomplish such change
in voting rights; that the shareholders' meeting on October
10, 1956, and the vote of the shareholders on the amendment
occurred in California, and that the filing of the certificate
of amendment in Delaware would result in a change in the
contract rights between the corporation and its California
shareholder residents, over both of whom the commissioner
had jurisdiction, and as to which a prior definitive permit
under California law was and is necessary.

The commissioner further found that for the purpose of
considering the application for a permit and to achieve over-
all fair play and substantial justice, the fiction of Delaware
residence should yield to the totality of California contacts
so as to require, in addition to compliance with the Delaware
law, the approval of the California Corporations Commis-
sioner as a condition to eliminating the right of cumulative
voting by the shareholders. Upon the commissioner's denial
of the definitive permit, Western applied for a rehearing,

[4]Section 25507: "If the commissioner finds that the proposed plan
of business of the applicant and the proposed issuance of securities are
fair, just, and equitable, that the applicant intends to transact its busi-
ness fairly and honestly, and that the securities that it proposes to issue
and the method to be used by it in issuing or disposing of them are
not such as, in his opinion, will work a fraud upon the purchaser thereof,
the commissioner shall issue to the applicant a permit authorizing it to
issue and dispose of securities, as therein provided, in this State, in
such amounts and for such considerations and upon such terms and
conditions as the commissioner may provide in the permit. Otherwise,
he shall deny the application and refuse the permit, and notify the
applicant in writing of his decision."

which was denied. Western then filed a mandamus action, which resulted in a remand upon stipulation on April 12, 1957. Hearings were again held as a consequence of the remand in June 1957. On February 5, 1958, the commissioner issued his findings and again denied Western's application. It is the findings and denial of February 5, 1958, that are here in issue.

After being denied a rehearing, Western filed its complaint for administrative review and for writ of mandate on February 28, 1958. The superior court made findings of fact and conclusions of law and gave judgment issuing the peremptory writ of mandate. In a memorandum opinion that court properly stated that mandamus was the proper action under the circumstances. (Corp. Code, §§ 25317, 25318; Code Civ. Proc., §§ 1085 through 1094.5.) In its opinion, the court relied upon *Moran* v. *Board of Medical Examiners,* 32 Cal.2d 301, 308-309 [196 P.2d 20] and *Tringham* v. *State Board of Education,* 50 Cal.2d 507, 508 [326 P.2d 850]. The court did not reject commissioner's argument that Code of Civil Procedure, section 1094.5,[5] provides that judicial review of proceedings before the commissioner is limited to the determination of whether there is substantial evidence in the light of the entire record to support his findings and order, but rather determined that the court had the specific power under Code of Civil Procedure, section 1094.5, subdivision (b), to extend its review inquiry to the question of whether the commissioner proceeded in excess of his jurisdiction. The court then indicated that it felt that there was but one issue for determination, which was whether the commissioner proceeded

[5]That section in part provides: ''(a) Where the writ is issued for the purpose of inquiring into the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in the inferior tribunal, corporation, board or officer, the case shall be heard by the court sitting without a jury. All or part of the record of the proceedings before the inferior tribunal, corporation, board or officer may be filed with the petition, may be filed with respondent's points and authorities or may be ordered to be filed by the court. If the expense of preparing all or any part of the record has been borne by the prevailing party, such expense shall be taxable as costs.

''(b) The inquiry in such a case shall extend to the question whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.''

" 'without, or in excess of jurisdiction' " as a matter of law, and then the court concluded that under the facts before it, the commissioner acted beyond his jurisdiction. The court indicated, in dealing with the Corporations Code and the Corporate Securities Law of the State of California, that such laws could only have application to transactions occurring within the State of California, that the amendment of the articles of incorporation was not a "sale" or "exchange" of stock and that the amendment of the articles of incorporation was an internal affair of Western and its shareholders. The court further stated that any changes in the "rights, preferences, privileges, or restrictions" of the outstanding stock would be ". . . accomplished outside the State of California" by the filing and recording of the certificate of amendment in the appropriate offices in Delaware. The trial court made some 50 findings of fact and 10 conclusions of law with main emphasis upon Western's extra-California activities.

On this appeal, the commissioner vigorously contends that his findings of fact must be accepted as the controlling facts of the case, and respondent, as staunchly, contends that the court's findings of fact must be accepted as controlling. The rule set forth in Code of Civil Procedure, section 1094.5, subdivision (b), is supported by the language in *Allen* v. *Railroad Commission,* 179 Cal. 68, 74-75 [175 P. 466, 8 A.L.R. 249], where in considering a similar problem with relation to jurisdictional findings by a commission, it is said: " 'It is plain, and indeed it has in effect been decided, that the declaration in that section that "findings and conclusions of the commission on questions shall be final and not be subject to review, has to do with the commission's determination upon questions of fact within its jurisdiction. When the question, ever one of mixed law and fact, goes, as here, to the jurisdiction itself, when the whole controversy revolves around the inquiry as to whether or not the corporation is a public utility, to say that the determination of the commission upon this matter is final and conclusive and is not subject to review, is the equivalent of denying to a petitioner a hearing upon a right carefully preserved to him by the language of section 67 itself. . . .' "

" 'Thus we are brought to a consideration of the evidence upon which the commission acted in holding this plaintiff to be *in toto* a public service corporation.' "

*People* v. *Lang Transportation Co.,* 217 Cal. 166, 171 [17 P.2d 721], sets forth the proper rule as follows:

". . . the determination of the board on the question whether the facts existing were sufficient to bring the case within the scope of its powers is subject to review in so far as they do, as here, present a question of law bearing upon the subject. In other words, *the finding of the board is not conclusive as to the facts necessary to the existence of the board's jurisdiction.*" (Emphasis added.) (See also Witkin, Summary of California Law, vol. 3, Constitutional Law, § 204, p. 2017.)

Insofar as the findings of the commissioner and the court pertain to the question of commissioner's jurisdiction to hold a hearing in circumstances such as those here disclosed, it would appear that the plain language of section 25009 [subd. (a)] of the Corporations Code providing that " '[s]ale' or 'sell' includes every disposition, or attempt to dispose, of a security or interest in a security for value. 'Sale' or 'sell' includes all of the following . . . an exchange; any change in the rights, preferences, privileges, or restrictions on outstanding securities" persuades us that the court below erred in finding that the commission had no jurisdiction to act in this matter. Many cases hold that where the Corporate Securities Act is violated by solicitation of sales of stock in California, the Corporate Securities Act applies even though issuance of the stock and the transfer of title are to take place in a foreign state. (*People* v. *Sears,* 138 Cal.App.2d 773, 791 [292 P.2d 663].) Furthermore, even criminal sanctions may properly be imposed under the above-stated rule where the main effectuation of a sale or transfer of stock takes place in California although the ultimate act may take place extraterritorially. (*People* v. *Alison,* 189 Cal.App.2d 201, 205 [10 Cal.Rptr. 859].)

*People* v. *Rankin,* 169 Cal.App.2d 150 [337 P.2d 182], specifically holds that even though the last act necessary to the issuance of a security such as the signing of documents occurs outside of California, the Corporations Commissioner is not thereby deprived of jurisdiction over the subject matter.

Respondent cites *Robbins* v. *Pacific Eastern Corp.,* 8 Cal.2d 241 [65 P.2d 42]; *B. C. Turf & Country Club* v. *Dougherty,* 94 Cal.App.2d 320 [210 P.2d 760] and *Jones* v. *Re-Mine Oil Co.,* 47 Cal.App.2d 832 [119 P.2d 219], to the effect that the commissioner has no extraterritorial jurisdiction, and that such jurisdiction as he has is limited to acts done or proposed to be done in California. The Robbins case, *supra,* on page 284, contains the following language: "It, therefore, follows that even if it be assumed that the negotiations in

California were illegal, nevertheless the validity of the sale in New York was not affected. This conclusion *makes it· unnecessary* to pass upon the contention of respondents, that the Corporate Securities Act, properly interpreted, has no application at all to negotiations had in California that contemplate the issuance and sale of stock in a foreign jurisdiction." (Emphasis added.)

*B. C. Turf & Country Club* v. *Daugherty, supra,* dealt with a state of facts which the court felt did not amount to the solicitation or the type of preliminary negotiation requiring a permit under California law. On page 332 of that opinion, it is expressly stated: ". . . the discussions had in California by Fraser during his short visit in September, did not amount to solicitation or the type of preliminary negotiation requiring a permit under California law." The opinion further contains the following language relative to ·the Corporate Securities Act (p. 329): "From a standpoint of interpretation, there can be no reasonable doubt but that these provisions of the statute require a foreign corporation to secure a permit to solicit a sale of its stock in this state, or to engage in preliminary negotiations looking towards such sale, even though the issuance of the securities and the transfer of their title will, in good faith, be completed in a foreign state. The sections quoted clearly prohibit a foreign corporation from soliciting in this state a sale of stock of its own issue without first securing a permit, even though in good faith the issuance of the stock and transfer of title are to take place in the foreign state. We also have no doubt that, although such a regulation may impose some restraint on interstate commerce and place some restriction on free speech, it is a valid exercise of the state's police power, and is not unconstitutional. It is true that in the Robbins case, *supra,* these problems were expressly left open and not decided, and that no other California case seems to have expressly determined these questions, but the suggested construction is so clear that reasonable minds cannot differ thereon, and the question of constitutionality has been so long settled that citation of authority would be superfluous."

As we interpret *Jones* v. *Re-Mine Oil Co., supra,* 47 Cal. App.2d 832, that case, insofar as it relates to the Corporate Securities Act, appears to rely upon the Robbins case, *supra,* and states at page 840: "All the parties here did go in person to Nevada; they there organized a corporation; they there paid for and had issued shares of stock in that corpora-

tion, and they there made an agreement regarding the conditions on which they would hold the shares. No suggestion is made that any of these acts were invalid under Nevada law. California law can have no application to them and they must be regarded as valid here." The instant case shows no such substantial extraterritorial dealing.

The case of *Transportation Building Co. v. Daugherty*, 74 Cal.App.2d 604 [169 P.2d 470], relied upon by Western, was one wherein a corporation requested approval of the amendment of its articles of incorporation to change its stock structure. The appellate court upheld a trial court's determination that the commissioner had acted improperly in denying such permit since such reorganization was an internal affair of the corporation. It appears that at the hearing held by the corporations commissioner, stockholders were invited to attend but none did; and the court based its opinion upon the ground that the commissioner did not find that the plan was unfair, unjust, or inequitable, nor that a fraud would be worked upon those who would acquire the new stock. On page 615 it is said: "There was no dispute whatever as to the facts, and there was no failure to disclose any facts in connection with the proposal. It is a fair, just, and equitable plan unless it is the reverse. It is an honest plan if it is not dishonest. There is no middle ground. The deputy commissioner evidently thought there was, and that without any finding or evidence to support a finding that the plan was unfair, unjust or inequitable, it was his duty to refuse the permit because of his opinion that the shareholders should be able to work out a better deal for themselves." The quoted language clearly distinguishes the instant case where proper findings were made under the relevant Corporate Securities Act sections.

Western earnestly insists that under the authority of *Southern Sierras Power Co. v. Railroad Com.*, 205 Cal. 479 [271 P. 747], the commissioner had no jurisdiction to act upon the amendment of the articles here proposed, again contending that such amendment is essentially an internal affair of the corporation. The Southern Sierras case was considered in *Gillis v. Pan American Western Petroleum Co.*, 3 Cal.2d 249 [44 P.2d 311], where it is put in its proper framework. In the last cited case, on page 252, it is said with reference to the Southern Sierras case: "The court held that the commission was without jurisdiction, for the reason that it was never intended by the Public Utilities Act of this state 'to subject

foreign corporations to regulation concerning the exercise of the inherent corporate powers conferred upon them by the legislative power of the incorporating state.' It was largely grounded upon the Fryeburg case, which was very similar in character. The Fryeburg Water Company was a Maine corporation doing business in both Maine and New Hampshire. It sought to compel the public service commission to approve that portion of a stock dividend which was represented by its capital investment in New Hampshire. The court refused the writ upon the statement that while the language of the act conferring authority upon the commission was quite broad it would not be 'presumed that the legislature intended to give the commission power to regulate the internal affairs of such corporations.' We have no criticism of these authorities. Indeed, in *Commonwealth Acceptance Corp* v. *Jordan,* 198 Cal. 618 [246 P. 796], this court called attention to the well-known fact that the laws of the several states authorize different capital stock structures for corporations, and under the doctrine of comity they are allowed, in the absence of express constitutional or statutory inhibitions, to enter other states for the purpose of doing business, regardless of whether a corporation with like structure is permitted to be formed in the latter states. However, these authorities are far from holding that the issuance and sale of the stock in a state other than that in which the corporation is formed is not a proper subject for legislative action. A number of authorities by their conclusions confirm the right of the state to protect its citizens, by legislative interposition, against the issuance or sale of stock in the state. Among these we cite, *Hohn* v. *Peters,* 216 Cal. 406 [14 P.2d 519]; *Hayden Plan Co.* v. *Friedlander,* 97 Cal.App. 12-16 [275 P. 248, 253]; *In re Flesher,* 81 Cal. App. 128 [252 P. 1057]. In the case of *London, Paris & American Bank* v. *Aronstein,* 117 F. 601-609, it is said: 'It is true that the courts in California cannot control the internal affairs of any foreign corporation. Such matters are to be conducted in pursuance of and in compliance with the provisions of the charter of the foreign corporation, and the laws of the country where it was created; but in the management and method of its business affairs in California with the citizens and residents thereof, *in the sale or disposition or transfer of the shares of stock,* it must conform to the laws of California in relation to such matters, and is bound thereby. In the recent case of *Williams* v. *Gaylord, supra,* 186 U.S. 157 [22 S.Ct. 798, 46 L.Ed. 1102], the Supreme Court of the United States said:

"When a corporation sells or encumbers its property, incurs debts, or gives securities, it does business; and a statute regulating such transactions does not regulate the internal affairs of the corporation." ' (Italics ours.) In *Hall* v. *Geiger-Jones Co.*, 242 U.S. 539-550 [37 S.Ct. 217, 61 L.Ed. 480, Ann. Cas. 1917C 643, L.R.A. 1917F 514], we find a similar statement of the purpose of legislation similar to that we are considering which is helpful in arriving at a sound conclusion. It is as follows: 'It will be observed, therefore, that the law is a regulation of business, constrains conduct only to that end, the purpose being to protect the public against the imposition of unsubstantial schemes and the securities based upon them. Whatever prohibition there is, is a means to the same purpose, made necessary, it may be supposed, by the persistence of evil and its insidious forms and the experience of the inadequacy of penalties or other repressive measures.' To like effect is *Merrick* v. *N. W. Halsey & Co.*, 242 U.S. 568 [37 S.Ct. 227, 61 L.Ed. 498]. The case of *Biddle* v. *Smith*, 148 Tenn. 489-494 [256 S.W. 453], is authority for the proposition that in order 'to protect residents of the state against the imposition of worthless investments offered by domestic and foreign investment companies under whatsoever guise presented,' the legislature is empowered to restrict valid issues to those which are in accordance with a permit therefor and to declare void other issues. To the same effect is *Edward* v. *Ioor*, 205 Mich. 617 [172 N.W. 620, 15 A.L.R. 256]. Conceding, therefore, the premise of respondents' argument that ordinarily speaking the issuance of capital stock or the stock structure of a corporation is an internal affair, yet the issuance and sale of stock within a state other than that of its organization may be regulated in order to protect the residents and citizens of the former state."

Western also urges that the case of *Order of United Commercial Travelers of America* v. *Wolfe*, 331 U.S. 586 [67 S.Ct. 1355, 91 L.Ed. 1687, 173 A.L.R. 1107], sustains the proposition that the commissioner had no jurisdiction to act as he did here. A reading of that case persuades us that its holdings are necessarily restricted by the facts therein to fraternal insurance associations. There were a number of such cases before the United States Supreme Court before the decision in *Wolfe*, and the court seems to have treated these cases as unique and to have established rules of law applicable only thereto.

The case of *Watson* v. *Employers Liability Assurance Corp.*, 348 U.S. 66 [75 S.Ct. 166, 99 L.Ed. 74] was one wherein it was contended that no action might lie against an insurer, where that insurance company was a foreign corporation qualified to do business in Louisiana, until after the insured's liability to pay damages had been finally determined either by judgment or agreement. The Supreme Court dealt with a Louisiana statute which provided for direct actions for injuries occurring in Louisiana (regardless of whether the insurance policy was written or delivered in that state), and which conditioned the right of a foreign liability insurer to do business in Louisiana upon the consent to allow suits under such statute. The court rejected the argument that such statute was violative of the equal protection, contract, due process and full faith and credit clauses of the federal Constitution and realistically recognized that a state has a legitimate interest in safeguarding the rights of persons injured there even though certain of the activities affected occurred beyond its boundaries.

It would appear that the provisions of the Corporate Securities Act here before us are a proper exercise of legislative discretion in requiring that corporate dealings with residents of this state be authorized by the Commissioner of Corporations, particularly where such corporation does a substantial amount of business within the state, and the act is not violative of the constitutional clauses of equal protection, contract, due process and full faith and credit if such legislative enactments operate equally upon such foreign corporations and domestic corporations in this state.

Furthermore, it appears here that since 1929 Western has recognized and submitted to the continuing jurisdiction of the California Corporations Commissioner. At that early date Western applied for and was granted a permit by the commissioner to allow the exchange of its shares for those of its California predecessor. At that time, the permittee represented to the commissioner that the shareholders of the California corporation would not be hurt in any way by the exchange. If the exchange had not taken place, the shareholders could not now be deprived of their right to cumulative voting, for a California corporation, by legislative act (Corp. Code, § 2235) must provide its shareholders with the right to vote cumulatively for directors. Thus it is apparent that the condition agreed to by Western as a basis for the original exchange of stock now tacitly prevents the company from

depriving its shareholders of a right which they would now have had if the 1929 exchange had not taken place.

Western complains that the commissioner, since the institution of this action, has created a new class of foreign corporation called a pseudo-foreign corporation, and urges that such definition of such corporation is mere fiat; that the commissioner has usurped the function of the Legislature which has seen fit to divide corporations into only two classes—domestic and foreign; and that the commissioner has seen fit by his arbitrary definition to create a third. Western's position in this respect is not well taken. The commissioner did not create any new class of corporation. He merely named a class of corporation which has, in effect, existed for many years, one with its technical domicile outside of this state but one which exercises most of its corporate vitality within this state. Unless it can be said that the Corporations Commissioner's characterization of such corporation as "pseudo-foreign" is arbitrary, it would appear to be a matter well within his administrative discretion. The concept of a pseudo-foreign corporation as defined by the commissioner and the well established concept of "commercial domicile" of a corporation appear to us to be founded upon reality.

There appears to be little difference in difficulty of concept between that of commercial domicile and that of pseudo-foreign existence. Each would appear to be descriptive of a particular type entity and neither would appear to have been created by a fiat or definition but rather by the nature, operation and establishment of certain corporations and the transaction of corporate business. For an interesting discussion of the concept of commercial domicile, see the case of *Southern Pacific Co.* v. *McColgan*, 68 Cal.App.2d 48 [156 P.2d 81].

The fact that since the commencement of this action the commissioner has seen fit to enunciate certain administrative rules which will be applied when dealing with a pseudo-foreign corporation does not indicate any abuse of his discretion. Such corporations have existed for many years, and naming them does not change their nature. Contrariwise, it would appear to be a just and fair administrative step to preinform those interested in such corporations as to the standards which will be applied by the commissioner in considering various applications and granting various permits.

Western properly contends that there is nothing basically evil in provisions giving shareholders the right of straight voting instead of giving them the right of cumulative voting.

This does not mean, however, that the commissioner's announced policy, that insofar as a pseudo-foreign corporation's coming into this state is concerned, the lack of provision for cumulative voting in its charter will be considered by him as a negative factor, is any abuse of his discretion. The argument that the commissioner has created another class of corporation is not persuasive, nor is the argument that legislative history relative to foreign corporations indicates that the Legislature, by eliminating earlier provisions requiring cumulative voting to be provided by all corporations and associations doing business in this state, declared an affirmative public policy allowing foreign corporations to provide whatever form of voting they wished persuasive.

It is certainly equally likely that the Legislature, by eliminating and failing later to reenact the sections requiring foreign corporations to provide for cumulative voting, intended to allow the appraisal of the fairness of the corporate structures of foreign corporations to be examined and appraised by the commissioner within reasonable limits of discretion, as it is that such legislative action was a declaration of public policy. It seems patent that if the Legislature may provide that all domestic corporations shall have cumulative voting, the commissioner may well, in his discretion, look askance upon any corporate scheme of voting which does not contain such rights. This is not to say that under certain circumstances the commissioner, in the exercise of sound discretion, could not approve the issuance of securities in a corporation which did not provide for such cumulative voting.

When we consider the complexity of present-day corporate structure and operation, and the far-flung area of corporate activities where transportation or nation-wide distribution of products may be involved, we are persuaded that the commissioner has this discretion. To hold otherwise, and to follow the argument of Western to its conclusion, would be to say that the commissioner might have the power in the first instance to require certain rights to be guaranteed to shareholders before he would permit the sale or issuance of a foreign corporation's stock in this state, but that immediately thereafter, by the device of amending the charter of such corporation in another state, the entire structure of that corporation, even to substantial changes in the rights of shareholders in California, might be legally effected. Such a holding would enable a foreign corporation to destroy the

rights which the State of California has deemed worthy of protection by the enactment of the Corporate Securities Act.

This position is not without support in other jurisdictions. The mere fact that the last act here necessary to effectuate the change in the voting rights of the numerous California residents who are shareholders of Western will take place in Delaware does not of itself necessitate a finding that the commissioner for that reason was without jurisdiction in this matter. Also, a fair and impartial reading of the pertinent Corporations Code sections convinces us that the amendment here sought is a ''change in the rights, preferences, privileges, or restrictions on outstanding securities'' (Corp. Code, § 25009, subd. (a), *supra*) of such nature as to be within the contemplation of the Legislature upon enactment of those sections.

Numerous arguments relative to comity between states are advanced by Western, but none of these appear to be sufficiently cogent to invalidate the above interpretations of the Corporate Securities Act sections here involved. It would seem too evident to require protracted dissertation that the right of cumulative voting is a substantial right, and one which the Legislature may well have had in mind when it enacted the code sections here under consideration.

While not binding upon the courts of this state, the reasoning and result reached in *State* ex rel. *Weede* v. *Iowa Southern Utilities Co. of Delaware*, 231 Iowa 784 [2 N.W.2d 372], (*State* ex rel. *Weede* v. *Bechtel*, 239 Iowa 1298 [31 N.W. 2d 853], cert. den. 337 U.S. 918 [69 S.Ct. 1159, 63 L.Ed. 1727] [same case on merits]) are persuasive of the above result. That case, at 2 N.W.2d 395, succinctly states: ''Simply because that State [Delaware] chartered the appellee [corporation] does not require Iowa to admit it to transact business within its border unconditionally'' in a case where the directors of the corporation proposed an amendment to the certificate which would change the value of outstanding stock.

Because of the foregoing the judgment of the superior court must be reversed.

 This, however, raises another disagreement between the parties, the commissioner contending that this court has before it the entire record of the proceedings before the Corporations Commissioner and must therefore review the entire record, citing Code of Civil Procedure, section 1094.5, *supra*. Western, however, argues that since the trial court never appraised the commissioner's findings from either the stand-

point of substantial evidence or, as it contends should have been done, an independent review of the evidence, the matter must be remanded to the superior court for trial. Western's position in this regard appears to be correct. The superior court's determination was confined to establishing whether or not the commissioner had jurisdiction. In so examining the record, the full review contemplated by section 1094.5 of the Code of Civil Procedure was not made. The court below determined there was no jurisdiction, and thus made no determination of the merits of the case, that is, whether there was substantial evidence to support the commissioner's findings. (See *Martin* v. *Alcoholic Beverage etc. Appeals Board,* 52 Cal.2d 259, 264-265 [341 P.2d 291].)

There is no express grant of the right of an appellate court to conduct a review in such a case without remand, and it would appear to be of doubtful wisdom to attempt such review in a court which is constituted as an appellate court when trial courts are established for that very purpose.

Reversed and remanded.

Fox, P. J., and Ashburn, J., concurred.

A petition for a rehearing was denied May 17, 1961, and respondent's petition for a hearing by the Supreme Court was denied June 14, 1961. Schauer, J., and Peters, J., were of the opinion that the petition should be granted.