Filed 5/29/13  Gomez v. Baio CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CLYDE GOMEZ,<br><br>    Plaintiff and Appellant,<br><br>  v.<br><br>BRUNO BAIO et al.,<br><br>    Defendants and Respondents. | No. B243785<br><br>(Super. Ct. No. BC460628) |

APPEAL from an order of the Superior Court of Los Angeles County. Amy D. Hogue, Judge.  Affirmed.

Herbert Abrams for Plaintiff and Appellant.

Matthew Soule for Defendants and Respondents.

_____

Plaintiff Clyde Gomez and principal defendant Bruno Baio entered into an agreement wherein Baio sold half of his catering corporation to Gomez for $115,000. Gomez later sued, ultimately contending Baio misappropriated the $115,000 Gomez paid by placing it into his private account rather than the corporation's capital account. Gomez grounded his claim on the theory that the $115,000 constituted startup capital for a new corporation, not payment to Baio for half of an existing corporation. After a bench trial, the trial court rejected Gomez's theory, concluding the $115,000 constituted payment for half of an existing corporation owned by Baio. Judgment was entered for Baio accordingly. On appeal, Gomez contends the court's ruling was unsupported by substantial evidence and constituted an abuse of discretion. We affirm.

## BACKGROUND

Because the parties waived court reporting below, we take the facts from undisputed allegations in the complaint, exhibits admitted at trial, and the trial court's statement of decision.

Baio is a successful restaurateur who operates groups of restaurants under the names "Crème De La Crepe Franchising, Inc." and "Crème De La Crepe of Westwood, Inc." In early 2010, Baio formed CDLC Catering, Inc., a venture that would provide catering services for restaurants in the Crème De La Crepe groups. Baio found and leased a location from which to operate CDLC, obtained all necessary equipment, took steps to incorporate the company and was its sole owner. The trial court found Baio did all of this "before he ever met Gomez."

On July 1, 2010, Baio and Gomez executed a one-page agreement that provided in full the following: "Effective July 01, 2010, Clyde Gomez owns 50% of CDLC Catering Inc. Clyde Gomez bought 500 shares out of 1000 shares of CDLC Catering Inc., for $115,000. [¶] The purchase of 500 shares or 50% of CDLC Catering Inc. by Clyde Gomez, includes equipment, furniture and fixtures, inventory, all clienteles, Beer & Wine License and all items and matters related to the business. [¶] Remaining 50% share equivalent to 500 shares is owned by Bruno Baio, resident of San Pedro, CA. [¶]

2

Therefore, Bruno Baio and Clyde Gomez are now owners of CDLC Catering Inc." The agreement was signed by "Bruno Baio."

Gomez paid the $115,000 in checks made out to Baio personally, after which Gomez became a signatory on CDLC's bank account with access to CDLC's bank statements. CDLC also "issued" Gomez a share certificate that was dated June 29, 2010. The certificate stated the corporation had authorized 1,000 shares of common stock with a par value of $0.10 each and certified that Gomez was "the registered holder of 500 shares" of the corporation.

Baio worked diligently to build CDLC's business, using employees from his other restaurants to prepare marketing materials and infusing his or his other companies' money into CDLC to cover rent and expenses. Gomez took no part in the operation or management of CDLC, expecting it to succeed due to Baio's reputation and track record with restaurants. By the time of trial in July 2012, the business was two months behind on its rent and had operated at a loss the prior year.

Sometime in 2011, after months of operation, Gomez noticed there was little money in CDLC's bank account and filed the instant lawsuit against Baio and others, alleging defendants defrauded him of the $115,000 he had paid. In the first amended complaint, Gomez alleged causes of action for fraud, negligent misrepresentation, conversion, breach of fiduciary duty, conspiracy, money paid, and money had and received. He alleged defendants represented that if he "invested the sum of $115,000.00, [he] would receive 50% of the stock of CDLC Catering, Inc. which would be a separate catering company and which would be operated in conjunction with [Baio's] group of retail and franchised restaurants . . . and would become the entity providing catering services for all such restaurants." Defendants falsely represented that Baio would operate CDLC in conjunction with his restaurant groups and use the corporation to provide catering services for all the restaurants in the groups. In reality, Gomez alleged, Baio operated a massive "Ponzi Scheme," "commingling and converting funds using entities which were not properly organized, permitted or licensed by the State of California.

3

Furthermore, Defendants never properly registered for a franchise for any of the Defendant Corporations who are illegally representing to the public that" one of the corporate defendants was a "legal franchisor." Further, Gomez alleged Baio breached his fiduciary duties by failing "to properly organize, register, obtain permits or complete the formation of CDLC Catering Inc. as required by California Law" and "became indebted to [Gomez] in the sum of $115,000.00." He sought damages in the amount of $115,000, damages according to proof, and punitive damages. Gomez did not seek rescission of the July 2010 agreement or allege a cause of action for breach of contract.

In July 2011, after the lawsuit was filed, Baio filed a "Notice of Issuance of Shares" with the California Department of Corporations, giving notice that CDLC had "issued" or proposed to issue 500 shares of voting common stock to Baio and 500 to Gomez. The value of the securities was stated to be $115,000 "in money" and $115,000 "in consideration other than money."

At trial, Gomez presented no evidence that any defendant made any false representation as alleged in the complaint or that Gomez relied upon any misrepresentation to his detriment. Gomez conceded that he received and still owned half of the stock in CDLC and that Baio operated CDLC as a separate catering company as promised. The court found no evidence suggesting any dishonest conduct or lack of diligence by Baio. On the contrary, the evidence showed Baio had worked diligently to build CDLC's business. Gomez also presented no evidence of the decreased value of CDLC or any other measure of damages other than testimony that CDLC was two months behind in its rent.

Gomez contended for the first time at trial that Baio misrepresented to him that his $115,000 payment would be invested in the corporation, rather than retained by Baio. The trial court found no evidence supported this allegation. On the contrary, the court found Gomez had admitted he merely assumed that the $115,000 would go to CDLC's operations account, but his conduct was inconsistent with even this claim, as the checks by which he paid the $115,000 were made out to Baio personally, not to the corporation,

4

and Gomez took no action when the cancelled checks and CDLC's bank account balance put him on notice that Baio had taken personal possession of the funds rather than giving them to CDLC.

The trial court interpreted the July 1, 2010 agreement as memorializing Baio's sale of half of his existing shares in CDLC to Gomez, as the agreement referred to the transaction as a "purchase" and referenced "500 shares out of 1000 shares," suggesting the shares predated the transaction. The court also found it significant that Gomez contracted with Baio personally, not with CDLC, and Baio had personally invested a substantial amount of time in the business and engaged an accountant to prepare incorporation documents before entering into discussions with Gomez. Baio "found the location, signed the lease, and obtained all of the necessary equipment to operate a 'special events' catering business" "before he ever met Gomez. He was therefore in a position to sell a portion of his ownership interest to Gomez." Furthermore, Gomez argued that the notice of issuance filed in July 2011 compelled the trial court to find that CDLC had *issued* 500 of its shares to Gomez for the $115,000, not that Baio *transferred* 500 shares to Gomez. He argued this showed the parties intended in July 2010 that CDLC, not Baio, receive the $115,000. The court was unpersuaded. Finding the 2011 notice of issuance to be only minimally probative as to the parties' intent in 2010, it wrote: "First, the content of this document is inadmissible hearsay. Even if it were admissible as an admission against interest (based on Baio's testimony that he instructed his assistant to fill it out as she did), its evidentiary value as parol evidence is slight because the document is a pre-printed form and it was prepared long after the agreement was signed. Since Baio did not originate the word 'issuance' to identify the transaction, it does little to reveal his intentions. Baio's assistant's election, long after the fact, to use an issuance form rather than a form specifying a transfer of shares does little to clarify the parties' intentions when they signed [the July 1, 2010 agreement]."

The court found Gomez's claims for conversion and money had and received failed because under the July 2010 agreement, Baio was entitled to the $115,000 at issue. It found Gomez failed to identify any fiduciary duty that Baio owed him and failed to prove the breach alleged in the complaint, i.e., "that CDLC failed 'to properly organize, register, obtain permits or complete the formation of CDLC Catering Inc.' as required by law." On the contrary, Baio produced numerous documents indicating CDLC was properly organized, registered, and permitted. Finally, the court found that even if Gomez had proven any of his claims, he failed to prove he suffered any damages, as he continued to own half of CDLC, which continued to operate as a caterer.

Judgment was entered for defendants, from which Gomez appeals.

## DISCUSSION

In the first paragraph of his opening brief on appeal Gomez expressly abandons his claims for fraud and negligent representation, leaving only claims for conversion, conspiracy and breach of fiduciary duty, and the common counts of money paid and money had and received. But of those five outstanding claims, Gomez ignores his causes of action for conspiracy and money paid, and we therefore deem them to be waived.[1] (*McComber v. Wells* (1999) 72 Cal.App.4th 512, 522 [the court may treat as waived any contention not supported by legal argument and citation to authority].)

To support his conversion claim Gomez contends on appeal that Baio kept for himself the $115,000 given to purchase half of CDLC, rather than pay the money into CDLC's operations account. The claim fails at the outset because by admitting the $115,000 belongs to CDLC Gomez necessarily admits that any claim for conversion would also belong to CDLC (*Oakdale Village Group v. Fong* (1996) 43 Cal.App.4th 539, 543-544 [the first element of a conversion action is "the plaintiff's ownership or right to

---

[1] Of course, it is well established that "[c]onspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510-511.)

6

possession of the property at the time of the conversion . . .”]), and he does not purport to bring this action on CDLC's behalf (*Jones v. Re-Mine Oil Co*. (1941) 47 Cal.App.2d 832, 842-843 [a claim for misappropriation of money owned by a corporation belongs to the corporation and must be brought on the corporation's behalf]).

Gomez similarly argues the cause of action for money had and received "is an appropriate claim in this case," but as with conversion, the cause of action would belong to CDLC, not Gomez. At any rate, the issue on appeal is not whether such a claim is appropriate but whether Gomez proved it at trial. On this issue Gomez is silent.

Finally, with respect to his claim for breach of fiduciary duty, Gomez alleged in the complaint that Baio failed to form or incorporate CDLC or operate it as a catering business, a claim the trial court found lacked merit. Apparently abandoning the claim on appeal, Gomez now offers the following one-sentence argument pertaining to Baio's alleged breach of fiduciary duty: "Here, Defendant, Bruno Baio's failure to place the $115,000.000 in the corporate account as mandated by [the July 2011 notice of listing] constitutes a breach of his fiduciary duty to Plaintiff and the corporation." Gomez made no such claim below, either in the complaint or at trial, and on appeal offers no further discussion or citation to the record or any authority. We therefore deem the claim to be waived. (*People v. Gray* (2005) 37 Cal.4th 168, 198; *People v. Catlin* (2001) 26 Cal.4th 81, 133; *People v. Barnett* (1998) 17 Cal.4th 1044, 1182; *People v. Stanley* (1995) 10 Cal.4th 764, 793.)

Because Gomez has expressly waived his claims for fraud and misrepresentation and impliedly waived his claims for conspiracy, money paid, and breach of fiduciary duty, and because his remaining claims, for conversion and money had and received, belong exclusively to CDLC, his appeal entirely fails.

In his reply brief Gomez argues the trial court misinterpreted the July 2010 agreement as permitting Baio to keep the $115,00 Gomez paid, rather than giving it to CDLC. Even if true, the point would be immaterial. Because Gomez has expressly and

7

impliedly waived all claims for fraud and breach of fiduciary duty, any remaining claim that CDLC was owed the $115,000 would belong exclusively to CDLC, not Gomez.

At any rate, the trial court's interpretation of the July 2010 agreement was reasonable. The agreement stated the $115,000 was for the "purchase" of 500 shares of CDLC. It is entirely reasonable to interpret this as effecting the sale of half of a corporation by the corporation's sole owner.

Gomez argues the July 2011 notice of issuance compels the conclusion that the July 2010 agreement contemplated payment to the corporation for issuance of 500 of its shares. We disagree. True, the notice of issuance stated CDLC shares were "issued" to Gomez and Baio in exchange for $115,000 "in money" and $115,000 "in consideration other than money," which supports Gomez's theory that the $115,000 he paid was intended to go to the corporation. But other evidence supports the trial court's conclusion that the money was intended for Baio. First, the July 2010 agreement itself did not mention "issuance" of any shares—it mentioned only "purchase" of shares. Second, as the trial court noted, the notice of issuance was only minimally probative of the parties' intent when they entered into the purchase agreement one year earlier. Third, Gomez did not contract with CDLC or pay it, he contracted with Baio and wrote checks payable to him personally. Fourth, even when Gomez was put on notice that the corporation did not possess the $115,000 he had paid, he did nothing for months. And finally and most importantly, Gomez never alleged in the complaint that CDLC was entitled to possession of the $115,000. On the contrary, he alleged *he* was entitled to it. Although the trial court reasonably could have concluded in light of the July 2011 issuance of notice that the July 2010 agreement contemplated payment of $115,000 to CDLC rather than Baio, it's contrary interpretation was also reasonable.

8

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED.

CHANEY, J.

We concur:

ROTHSCHILD, Acting P. J.

JOHNSON, J.

9